Opinion by
Mr. Justice Hall.
The parties appear here in the same order as in the trial court. We refer to them as plaintiffs and defendants, or by name.
Presented here for review is a judgment and decree wherein plaintiffs were denied damages for alleged overgrazing of their lands by defendant Ackerman, and Lowsleys and Woodhams were ordered to execute and deliver deeds pursuant to an alleged agreement to “exchange” the lands directed to be conveyed.
In 1949 Ackerman was the record owner of Sec. 2, Twp. 11, N., R. 70, and all of Sec. 6, Twp. 11, N., R. 69, except the SE% SW% and SW% SE%. At that time one Swanson was the record owner of an undivided interest in Sec. 1, Twp. 11, N., R. 70, and the aforesaid SE% SWy± and SW'A See. 6. (The record does not disclose the extent of Swanson’s interest in 1949. In 1953 he acquired a full interest in the property.)
The foregoing lands are grazing lands; portions thereof are very rough and rocky, making fencing difficult and expensive. In 1949, presumably on or near the line between Sections 1 and 2, there was an old fence which was down in some places, and in some places there was no fence at all. There was no fence enclosing the SE % SW% and SW% SE% of Section 6.
In 1949 Ackerman and Swanson met and mutually agreed that Ackerman could use, more advantageously than Swanson, a part of Swanson’s land, being a strip of land lying immediately to the east of the line between Sections 1 and 2, being a part of Section 1, consisting of about 100 acres; and that Swanson could use, more advantageously than Ackerman, a part of Acker *268 man’s land, being the SW1^ SW%, and portions of the NW% SW% and the SE% SE% of Section 6, consisting of about 60 acres.
Ackerman and Swanson concluded that fences could be erected at reasonable cost whereby the above described strip of land in Section 1 would be enclosed in Ackerman’s pasture, and the above mentioned lands in Section 6 would be enclosed in Swanson’s pasture.
Ackerman agreed to do the fencing in Section 1 and Swanson agreed to do the fencing in Section 6. Each, at substantial cost, built the fences as agreed. There were no surveys and the location of these fences with reference to sectional and fractional section lines is not known; however, the fence which Ackerman built is supposed to include in Ackerman’s pasture about 100 acres of Swanson’s lands, and the fence that Swanson built is supposed to include in his pasture about 60 acres of the lands of Ackerman. Neither objected to where the fences were built.
At that time Ackerman and Swanson had some discussion with reference to an agreement for an exchange of lands in accordance with the aforementioned fencing arrangement.
There was no writing and the only evidence of an agreement is found in the testimony of Ackerman, Swanson and one Nauta, to whom Swanson deeded his ranch in 1956 and who in turn deeded the same to plaintiffs in 1957.
Ackerman testified:
“Q Now, did you have a conversation with Mr. Swanson * * *?
“A. Well, he came over there, and we talked about the trouble that had been, his cattle would be in with mine and mine with his, and he says, ‘Well, it don’t make any difference to me, I will give you this over here, I will just go right up the gulch, the easiest way to put a fence in there.’ I said ‘That is O.K. with me, *269 my cattle wouldn’t break in on your west side.’ I went and got a posthole digger where we could try this post-hole digger. That is where we went.
“Q What was done?
“A He was giving me a portion of 1.
“Q What did you say about what you were to do?
“A He was going to take and put the fence where he wanted to in [Section] 6 there, and I was to put my fence over on section 1 where I could go with the digger. That is what we did.
“Q What was said about exchange of deeds if anything?
“A Well, at the time we were both probably pretty hard up, and Mr. Swanson said he couldn’t afford to have this surveyed and deeds made. I said, Well, I can’t either, and we will just let it go at that,’ and Mr. Swanson replied and said, ‘If you sell out, just tell the people that buy the place the deal,’ and I said, ‘All right, and you do the same thing,’ and he said ‘That is what I will do.’
“Q Then after you had made this exchange, who owned what?
“A I owned everything west of the fence and he owned everything south of the fence.
“A * * * they [Woodhams, in 1961] * * * said they didn’t want me or my cattle on their land [west part of Sec. 1], and I had better put the fence back, and I said, ‘Well, you knew of the trade and I am not about to put the fence back.’ I said, ‘If you want this fence back, you have it surveyed and put it on the right line and put the fence back at your cost,’ I said, ‘It is all right [with] me.’ * * *
* * *
“Q Now, as I understand it, you told Mr. Woodhams that if they would move this fence back to the section line, it would be all right with you?
*270 “A I said survey the section line.
“Q In other words, you don’t know whether the fence now is on the section line or not?
“A That’s right.
“Q But you want them to put it on the section line?
“A That’s right.
“Q Let me ask you this, Mr. Ackerman. If a fence was put on the true section line, how much land would you gain or lose?
“A I haven’t any idea.
“Q Would it be as much as an acre?
“A I don’t know.
“Q Would it be worth as much as four dollars?
“A It might be and might not.”
Mr. Swanson testified:
“Q What was the agreement between you and him [Ackerman] concerning this fence and this land?
“A Well, we agreed — I couldn’t afford at that time to have it surveyed or have an abstract or anything made, so I told Ed I couldn’t afford to spend any money on it outside of the fence, and it would be a benefit to both of us, it ought to stay this way. Ed said, ‘What if one of us sells?’ I said, ‘Just tell anybody that buys it is that way.’
“Q After you made this arrangement, who owned the land south in section 6?
“A I figured I owned it then.
“Q After you made this exchange, who owned the land west of the fence in Section 1?
“A I figured Ed owned it.
“Q At the time you made this exchange, you said you didn’t exchange deeds because you couldn’t afford a survey?
“A I couldn’t afford a survey or abstract.
“Q But you could have described it at that time, couldn’t you, just like I have described it now?
*271 “A Yes, we could have.
“Q But you didn’t do that?
“A No.”
Mr. Nauta testified:
“Q Did Mr. Swanson [at the time he sold his ranch to Nauta] explain the situation of the fence line drawing and diagram up there between A and B?
“A Yes, he did. We rode along there and he told me that he had let Mr. Ackerman move that fence line over, I think down aways. The old line was all up.
“Q Did he say he moved the old line over?
“A Yes.
“Q What else did he say about this line?
“A Well, that was about all that was said, that Ackerman put up the fence, and then over on section 6 he had done the same thing.
“Q And did he explain to you about a trade?
“A I never heard a thing about a trade, no land trade.
“Q When was the first time you heard about a land trade?
“A Today.
“Q What did Mr. Swanson say about that fence line at that time?
“A Well, it was about the same thing. He explained that he had let Mr. Ackerman move the fence down on the rim, and I believe he said he could move it back at any time if he wanted to.
“Q Did you ever tell Mr. Woodhams that your understanding was this was a temporary or permanent arrangement?
“A I didn’t know. I thought it was temporary.
“Q Your understanding was it was a temporary arrangement?
“A Sure, that is, the land.”
Other evidence conclusively showed that:
1. Ackerman, Swanson and his successors in interest,. *272 Nauta and Woodhams, at all times after the alleged exchange of lands, paid taxes on all of the lands, record title of which stood in their respective names.
2. Ackerman, by warranty deed, during the pendency of this suit conveyed to the defendants Lowsley, all of the lands which he owned of record. He did not undertake to convey to them any part of Section 1 nor to withhold from them any lands in Section 6, except the SE% SW% and the SW1^ SE1^. In other words, he conveyed his record title, and in total disregard of the alleged agreement of 1949.
3. Ackerman, in 1961, told Woodhams, “If you want this fence back, you have it surveyed and put it on the right line [the line between Sections 1 and 2] and put the fence back at your cost.”
4. Swanson, in 1953, mortgaged his ranch and therein did not include the lands in Section 6, which it is alleged he obtained through the exchange agreement, nor did he eliminate from the mortgage the portion of Section 1 which it is contended after 1949 belonged to Ackerman — he at that time warranted that he owned all of Section 1. This mortgage covered lands of which Swanson was the record owner and was in total disregard of the alleged agreement.
5. In 1956 Swanson by warranty deed conveyed his ranch to Nauta — again, he did just as he had done in mortgaging the ranch in 1953.
6. Nauta, in 1957, by warranty deed conveyed the Swanson ranch to Woodhams. His conveyance gave no effect to the alleged exchange. His deed included all of Section 1 and only the SE% SW% and SW% SE% of Section 6.
The trial court found that Ackerman and Swanson had entered into an agreement in 1949 to exchange lands, that each had partly performed the agreement by taking possession of and fencing the respective lands exchanged, and that their successors in interest “had notice of and opportunity to have full knowledge of the *273 exchange agreement * * and that the exchange “was fully performed except for the formality of executing exchange deeds, * * *.”
In its decree the court directed (1) that Woodhams “make conveyance of all * * * land in Sec. 1, * * * lying West of the fence line constructed by defendant Ackerman, to defendants Lowsley * * *, and that such conveyance be made within ten days after legal description thereof is obtained, * * * through survey * * *, at the expense of * * * Ackerman”; (2) that “defendants Lowsley convey to plaintiffs all their right * * * in all land lying South of the fence constructed by * * * Swanson through Sec. 6, * * *,” and (3) “that plaintiffs convey to defendants Lowsley * * * all their right * * * to any land lying North of said fence * * *, and that such conveyance may be by reference to said fence as a monument if desired by defendant [?] unless plaintiffs supply a metes and bounds description of said fence line * * * at their expense, or * * * Ackerman elects so to do, which desire, if on the part of plaintiffs [?], shall be expressed within ten days hereafter; and that such description be tied to the Southeast corner of said Section 6 and follow said fence to its end * * * the Section line common to Section 6, and Section 1 * * *.”
The court ordered the parties to this litigation to do things that neither they nor their predecessors in title ever agreed to do. There was no agreement to exchange deeds. Ackerman and Swanson were hard up and could not afford surveys, abstracts or deeds.
Deeds could have been exchanged in 1949, or at any time during the next twelve years prior to the commencement of this action. Ackerman and Swanson testified as to how the lands to be exchanged could be described as, (1) that part of Sec. 1 lying West of the fence — about 100 acres; (2) that part of Sec. 6 (except SELi swy4 and SW% SEy4) lying South of the fence — about 60 acres.
Swanson never owned anything north of the fence *274 in Section 6, by deed or the alleged exchange agreement; he did not convey anything to Nauta north of the fence, and yet the trial court ordered Woodhams, Nauta’s grantees, to convey to “defendants Lowsley in joint tenancy all their right * * * to any land lying North of said fence * *
The fact that in 1949 legal descriptions were not readily available, that the cost of placing fences on true boundary lines was great, that the value of the lands involved was relatively small, and the fact that the respective owners were hard up, cannot serve to dignify loose and contradictory talk such as, “We made an exchange,” and after that, “I owned everything west of the fence and he owned everything south of the fence,” “I told him ‘put the fence back * * * it is all right [with] me,’ ” “I never heard a thing about a land trade,” “I thought it [the trade] was temporary,” to serve as a transfer of title to real property.
The so-called exchange agreement of 1949, coupled with all the subsequent actions of Ackerman, Swanson, Nauta, Lowsley and Woodhams, is more compatible with an agreement for exchange of use than one for exchange of ownership. If the agreement made in 1949 is for exchange of use, it was at once and continuously effective until 1961; fencing was essential to such exchange and has nothing to do with exchange of ownership. If the agreement be for exchange of ownership, it has for twelve years remained wholly ineffective, and every act of the parties during said period, such as payment of taxes, execution of warranty deeds and mortgages, all of which was done according to record titles, is at complete variance with an agreement for exchange of titles.
If the agreement was one for exchange of use, then the parties have been paying taxes on that which they own, conveying with warranty that which they own, mortgaging that which they own and using each other’s lands pursuant to the agreement. On the other hand, if *275 the agreement was to transfer ownership, we find the parties doing nothing for twelve years to accomplish their purpose; we find them paying taxes on that which they do not own and neglecting to pay taxes on that which they do own, conveying lands with warranty of title that they no longer own and failing to convey that which they did own, mortgaging lands that they did not own and neglecting to include in mortgages lands which they did own.
The law is well settled that equity will, under certain circumstances, order specific performance of oral agreements for the sale or exchange of lands and the titles thereto; however, the general rule is stated in 49 Am. Jur. 34, Specific Performance, § 22:
“* * * Tim indefiniteness of an agreement is an adequate reason for refusal to direct specific performance thereof. The contract itself must make the precise act which is to be done clearly ascertainable. It is fundamental that in order to do this and to enable the court to decree specific performance, the terms of the contract must be clear, definite, certain, and complete. The contract must be free from doubt, vagueness, and ambiguity, so as to leave nothing to conjecture or to be supplied by the court. * * *.”
In Von Trotha v. Bamberger, 15 Colo. 1, 24 Pac. 883, we find the following language:
“* * * Acts of part performance, such as will furnish a foundation for enforcing a verbal contract respecting land otherwise void under the statute of frauds, must be such as are done in pursuance, or according to the terms, of the contract, and which in some manner affect or change the relation of the parties in respect to the property whereby one of the parties would be defrauded if the contract were not enforced. 1 Story, Eq. Jur. §§ 759-766; 3 Pom. Eq. Jur. § 1409; Gill v. Newell, 13 Minn. 462 (Gil. 430.”
 Considering all of the testimony with reference to the agreement, the subsequent acts of the parties and *276 their successors in interest, we conclude that the evidence does not support the finding of the trial court that there was an agreement to exchange deeds or the ownership of lands. Fencing was not “part performance” of an agreement to exchange deeds or ownership, but in furtherance of an agreement to exchange use.
Counsel for defendants suggest that the trial court was the trier of the facts and its findings are binding on this court. The trial court did not find that the parties had agreed to exchange deeds. There is nothing in the record which would support such a finding had it been made.
The judgment of the trial court dismissing plaintiffs’ claim because of lack of proof of damages is correct and is affirmed.
The judgment sustaining Ackerman’s counterclaim and Lowsley’s supplemental counterclaim is reversed and the cause is remanded to the trial court with directions to dismiss the same and all claims therein set forth.
Mr. Justice Sutton and Mr. Justice Frantz concur.